## UNITED STATES v. THOMAS.

### *(Circuit Court, W. D. Wisconsin. January 6, 1891.)*

INDIANS—JURISDICTION OF CRIMES ON RESERVATIONS.

    The provisions of Act Cong. March 3, 1885, (23 St. at Large, 385,) that all Indians committing certain crimes within the boundaries of any state, and within the limits of any Indian reservation, shall be subject to the same laws, and be tried in the same courts and in the same manner, and be subject to the same penalties, as are all other persons committing any of said crimes within the exclusive jurisdiction of the United States, do not apply to such a crime committed within the sixteenth section of a township, which section, although within the outside limits of an Indian reservation established in accordance with a treaty with the Indians, was ceded to the state for the use of schools by the act of congress admitting the state into the Union, passed previous to the treaty, and, after the lands were surveyed, subsequent to the treaty, was sold by the state to a grantee, who entered into possession thereof long before the commission of such crime therein. BUNN, J., dissenting.

At Law. On motion in arrest of judgment, on conviction on indictment for murder.

*Hollen Richardson,* for the motion.

*Samuel A. Harper,* U. S. Atty., opposed.

Before GRESHAM and BUNN, JJ.

GRESHAM, J. Michel Thomas, a full-blood Indian of the Chippewa tribe, was convicted of the murder of David Corbine, a half-breed of the same tribe, and a motion was made in arrest of judgment. Section 9 of the act making appropriations for the Indian department for the fiscal year ending June 30, 1886, (Act March 3, 1885; 23 St. at Large, p. 385,) reads:

"That immediately upon and after the date of the passage of this act all Indians committing against the person or property of another Indian, or other person, any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny, within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner, and shall be subject to the same penalties, as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians, committing any of the above crimes against the person or property of another Indian, or other person, within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

The indictment charged that the offense was committed in the state of Wisconsin, within the limits of Lac Courtes Oreilles Indian Reservation. Section 7 of an act passed in 1846, (9 St. at Large, p. 58,) admitting the territory of Wisconsin into the Union as a state, ceded to the state, for the use of schools, section 16 in every township of public lands within the state not sold or otherwise disposed of. The United States entered into a treaty with the Chippewa Indians in 1854, by which, in consideration of certain relinquishments made by them, the government agreed to set apart and withhold from sale a tract of land on Lac Courtes Oreilles, equal in extent to three townships, the boundaries of which should be thereafter agreed upon or fixed under the direction of the president. The lands in that part of the state were not surveyed until a year after the treaty. In 1859 Lac Courtes Oreilles reservation was established in accordance with the terms of the treaty, and the chiefs and headmen, who represented the tribe, agreed to use every effort to induce their people to abandon the lands ceded to the United States by the treaty, and reside upon the reservation. In 1872 the Indian department sent to the state's land-office a map of the reservation, showing the exterior boundaries, as well as interior lines, embracing lands not made part of the reservation. The offense was committed on one of the sixteenth sections thus designated on the map. The state sold this section in 1865, and its grantee entered into possession, and denuded the land of its pine timber. The title to the sixteenth sections of the surveyed lands vested in the state when it became a member of the Union under the act of 1846, and the title to the sixteenth sections in the unsurveyed public domain in the state vested in it when those sections were subsequently located and defined by surveys. The sixteenth sections within the exterior boundaries of the reservation, as it was agreed upon and established in 1859, had belonged to the state since 1855, and the government had no more right to take them for an Indian reservation than it had to take the lands of individual proprietors for the same purpose. The state's right of dominion over these sections, including the right to sell, became complete when they were located by the survey in 1855. The government's right to occupy or otherwise control them then ceased, and it

follows that the Indians thereafter acquired no right of occupancy from the government. The offense was committed in 1889, on one of the sixteenth sections within the outer boundaries of the reservation, but not on land constituting part of it. That section was sold by the state in 1865, and the purchaser entered into possession, and denuded it of its pine timber, as he lawfully might. A fair interpretation of the last clause of the statutes quoted shows that congress intended to confer jurisdiction on the federal courts to punish Indians who committed the specified offenses upon an Indian reservation in a state; that is, upon lands belonging to the United States within a state, and occupied by Indians as a reservation.

The court has no jurisdiction of the offense, and the motion is sustained.

BUNN, J., (*dissenting*.) Believing, as I do, that the court has jurisdiction of this case, I am compelled to dissent from the conclusion reached by the circuit judge. I cannot think that the jurisdiction of the court turns upon the question of the government's title to the land on which the offense was committed. Moreover, the section 16, township 40, range 8, upon which the murder was committed had always been a part of the Indian country, and the possessory title of the Indians to it had never been divested, unless by the treaty which gave them this, with other lands. In 1854 a treaty was made between the government and the Indians, by which the Indians were to take, in lieu of all the lands which they occupied, and for a long time before had occupied, in that region, the equivalent of three townships of land in Sawyer county. This was before any survey of the land was had. During the next two years the land was surveyed, and in 1859, by agreement between the commissioners on the part of the government and the Indians, the treaty of 1854 was carried into effect by a selection and location of the lands. The land was taken in contiguous sections and in as compact form as was possible, and this section 16, where the murder was committed, was a part of the reservation agreed upon. The land so selected and agreed upon pursuant to the treaty was withdrawn from market and platted, and set apart by the government for the use of the Indians, who have occupied it as a reservation, under the charge and superintendence of the government, for 37 years since the date of the treaty, and for 32 years since the date of the selections in June, 1859. Whoever should be considered as the owner upon a proper trial of the question of the title to section 16, one thing is manifest, that this section, with all the others going to make up the reservation, had constituted a reservation *de facto* for all that time, and, as such, the government has claimed and exercised jurisdiction over it. And now comes in the statute, (section 9, c. 341, Laws 1885,) and says that all Indians committing murder, manslaughter, rape, assault with intent to kill, arson, burglary, or larceny against the person or property of another Indian, or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried by the same courts and in the same manner, and

subject to the same penalties, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States. Section 16, as shown by the evidence, is within the outside limits of the reservation, it being two miles from it to the nearest outside limit. It is also a part of the land actually selected by the commissioners pursuant to the treaty, and platted and set apart by the government for the use of the Indians, and though, in 1865, the state of Wisconsin assumed to sell it, and the purchaser went on and stripped it of the pine timber growing upon it, it has been vacant and unoccupied always, except as used and occupied by the Indians previous to the treaty in 1854, under their own possessory right, which was always recognized by the government, and since that time as a part of the reservation selected and set apart by the government for their occupancy and use. Why, then, is it not within the limits of the reservation, within the true meaning of the law of 1885, so far as the question of jurisdiction is concerned? It seems certain that the United States has assumed jurisdiction over this land for the government of the Chippewa Indians, and I fail to discover any intrinsic difficulty in its doing this, especially so long as the government does not, by the statute in question, assume to take jurisdiction to punish for the offenses named, on the ground of exclusive governmental jurisdiction over the territory, (as in the case of the District of Columbia, and forts, arsenals, ship yards, etc., within the limits of any state, where the constitution gives exclusive jurisdiction of other criminal offenses committed within a state of the Union,) but upon the ground that the subject-matter is one of national cognizance.

The statute under which the prisoner was tried received full and exhaustive consideration by the supreme court in *U. S.* v. *Kagama,* 118 U. S. 375, 6 Sup. Ct. Rep. 1109, and the jurisdiction of congress to pass the act, and that of the United States court to punish for the offenses named therein, were sustained; not, as I read that case, on the ground of exclusive jurisdiction, because of the government's owning the land, or having general or exclusive governmental jurisdiction over the territory embraced within an Indian reservation, but because the subject-matter, which is the management and control and government of the Indians under the charge of the United States, is necessarily one of national cognizance. "The Indian tribes were the wards of the nation. They were communities dependent on the United States for their political rights. They owed no allegiance to the states; and received from them no protection. Because of the local ill-feeling, the people of the states where they were found were often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, there arose a duty of protection, and with it the power. This had always been recognized by the executive and by congress, and by the supreme court, whenever the question had arisen. For this reason it was within the power of congress to enact the law giving the United States jurisdiction of these crimes." The statute was again up for consideration by the same court in *Re Gon-Shay-ee,* 130 U. S. 343, 9 Sup. Ct. Rep. 542, and the former decision

of the court recognized and affirmed. Of course, the jurisdiction of the courts is limited by the words of the statute. The offense must have been committed within the limits of an Indian reservation within a state. Not that congress might not probably have made the law broader, and given jurisdiction over the same offenses committed by an Indian under the charge and superintendence of the government in any part of the state, as it had before given a like comprehensive jurisdiction under the statute relating to the sale of intoxicating liquor to Indians under the charge of an Indian agent. But it did not. The offense must be committed within the limits of an Indian reservation, to give the court jurisdiction. As said by DEADY, J., before the law of 1885 was enacted, in *U. S. v. Barnhart,* 22 Fed. Rep. 288:

"The question is not one of power in the national government, for, as has been shown, congress may provide for the punishment of this crime wherever committed in the United States. Its jurisdiction is co-extensive with the subject-matter,—the intercourse between the white man and the tribal Indian, —and is not limited to place or other circumstances."

I cannot see that the question of title is at all material. I suppose that when Wisconsin was admitted into the Union as a state under the enabling act of August 6, 1846, considerably more than one-half of the whole state was government land, and the title still in the United States. But, upon its becoming a state, general governmental jurisdiction in local matters passed from the government to the new state, and that without regard to the title to the land, whether in the government, in the state, or in individuals. The United States only retained jurisdiction over subjects of national concern and cognizance, except as to any places within the state purchased by the government, with the consent of the legislature of the state, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings, according to article 1, § 8, of the constitution.

Congress could not give the United States courts general jurisdiction to punish for murder or rape or robbery, though these crimes should be committed upon land belonging to the general government. But the general government retained jurisdiction over all subjects of national concern and cognizance, where the subject-matter gave it jurisdiction under the constitution. And it is on this ground that jurisdiction comes to these courts, under the statute in question, and not at all upon ground analogous to that, where jurisdiction is taken within states over all crimes committed upon land owned and occupied by the government for the purpose of the erection of forts, arsenals, dock-yards, etc. Of the two hundred or more prosecutions by indictment brought in the United States district and circuit courts of this state where it has been my duty to preside within the last year, in not a single instance, unless this case be an exception, has jurisdiction been given to these courts upon any other ground than that the subject-matter of indictment was of national concern, under the constitution and laws of the United States. Now, then, if the title or general legislative and governmental jurisdiction is not a necessary element in the question, the only inquiry is whether the murder was committed within the limits of an Indian reservation, set apart

and recognized by the government, and actually occupied by the Indians for reservation purposes; and that it was is evident from the testimony and undisputed facts.

It did not seem to me to be worth the while, or very appropriate, to look into and decide a question of title arising, as this did, in a collateral way, in a criminal proceeding, unless absolutely necessary. The state was not a party, and could not be bound by any decision that might be made. It was in evidence that the title to these sixteenth sections within this reservation had been in dispute. The state claimed these lands under the enabling act for Wisconsin, (see 9 St. at Large, p. 56,) which provided "that section numbered sixteen, in every township of the public lands in said state, and, where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said state for the use of schools." The land department at Washington had always claimed that, by the treaty with the Chippewa Indians already referred to, made in 1854, the sixteenth sections, of which there are three included in the reservation, had been disposed of by the government before any survey of the lands was made, and consequently before the claims of the state could attach. And this contention seems plausible. The land in that vicinity had always been Indian land, and occupied by them, the evidence showed, certainly for 50 years, which is as far back as the memory of the witnesses ran. It had in fact been occupied by them from time immemorial. The government recognized their possessory right, and set to work to make a compromise, by which the Indians were to take and keep possession of a definite portion of these lands, and to give up all claim to the rest. With this view, the treaty of 1854 was entered into. Now it was exceedingly desirable that the three townships to be devoted to the exclusive use of the Indians, and on which definite allotments were to be made to individuals in severalty, should be composed of contiguous territory, and be in as compact form as possible. Every consideration looking to the well-being both of the Indian tribe and the white people of the state pointed that way. But how could such a policy, no doubt contemplated by the treaty, be carried out, if, so soon as the survey of the country should be made, every sixteenth section should go to the state? It was no hardship for the state to receive other lands in the place of these, which, under the treaty, it would be wise and judicious should be taken by the Indians to make the reservation in contiguous and compact form. This is the view, as I understand, which has been taken by the National land department in regard to the sixteenth sections, by agreements between the government and the Indians, pursuant to treaty made in 1854, before the lands were surveyed, and having for one object the extinguishment of the Indian title to a large tract of country; that they must be considered as disposed of, within the meaning of the enabling act of 1846; and that the state should accept other lands in their place. The Hon. Jos. A. Wilson, commissioner of the general land-office, writing to Hon. H. E. Paine, member of congress from Wisconsin, on December 17, 1870, (see letter in evidence,) says:

"The sixteenth section of each of the above townships, [39 and 40,] except town forty, (40,) range seven (7) west, is embraced within the reserve; and, since these lands were at the date of the reservation unsurveyed, and have not been returned to the public domain, or opened to disposal, as other public lands, in Wisconsin, we are of the opinion that the state has never acquired title to said 16th sections, nor can we recognize the swamp-land sections, within the present limits of said reserve, for the reason that the selections were made whilst the lands were in a state of reservation, from which they have not since been relieved. The same argument relates to the La Pointe band of Indians, which has remained as originally reserved."

But, without passing any opinion upon this question of title to the sixteenth sections which has been so long in dispute, and is still unsettled, it has seemed to me quite clear, as this section was a part of the lands agreed upon, platted, and set apart by the government as and for a reservation, and occupied so long by the Indians as such, the government claiming it as a part of the reservation, and assuming to extend its jurisdiction over it for the purpose of the control and proper management of the Indians, that, for all objects of jurisdiction for the purposes indicated, the United States courts should exercise it. As a practical matter, it will certainly be very embarrassing if this question of whether a crime, confessedly committed within the outside limits of an Indian reservation, was on this side or that side of a quarter line, or some line dividing a meandered lake or stream and the surveyed land adjoining it. The government farmer or subagent, residing on one of these reservations, owns in fee the piece of ground he occupies. There are numerous small pieces of land in the reservation belonging in fee to individuals.

The evidence also shows that there are two or three small meandered lakes in this reservation. There may also be meandered streams. These are not included in the lands selected, which make up the 69,114.29 acres constituting the Lac Courtes Oreilles reservation, though within the outside limits of the reservation. The general supposition has been that, upon the state's coming into the Union, the title to the lands under this meandered water goes to the state; but, whether the title is in the government or the state, suppose one Indian kill another on one of these lakes or streams, being within the outside limits of the reservation. It is within the Indian country, and within the limits of the reservation. Will these courts take jurisdiction under a liberal, but practical and just, interpretation of the act, or must such cases be handed over to the state tribunals, with the prospect of a keen dispute about lines and titles, and a clashing of jurisdictions in half the cases that shall arise? This is not, however, by any means the question the court is called upon to decide in this case, as here the land on which the crime was committed is a part of the reservation, as agreed upon and platted, while the meandered lakes and small tracts belonging to individuals are not. The sixteenth section was within the inside, as well as outside, limits of the reservation. It will practically, moreover, be very difficult to administer justice in criminal matters on these reservations if these fine distinctions in regard to boundaries are to prevail. These controversies will arise quite often enough if it be held that the court has ju-

risdiction of all cases defined in the law arising within the outer limits of the reservation. And what objection there can be to such interpretation I am unable to see. It is feasible and practical. It will subserve the ends of justice, and will save embarrassment and complication. In the case at bar the government came into court prepared to show that the murder was committed within the outside limits of the reservation, the nearest limit one way being two miles, and the next nearest the other way three miles. The defendant had no witness who knew just where the lines ran at the place where the murder was committed. But the evidence tended to show that the road where the deed was done ran across the corner of section 16, cutting off a small piece about three rods wide at one end, and running to a point at the other six or eight rods away. It was a road that the Indians traveled constantly, leading from their village at Courtes Oreilles lake to their village at Round lake, only a short distance from the scene of the murder. The country was wild and unoccupied, except that the Indians had built their wigwams there, and had hunted and traveled and made their trails over and across it. I think it clear that congress, by the act of 1885, intended to give jurisdiction in such a case; and that it was within the power of congress to do it, I entertain as little doubt. The subject-matter of that statute is the government of the Indians, who are the wards, and under the charge and tutelage, of the nation; and it is the subject-matter, and not the title to the land whereon the crime is committed, which gives these courts jurisdiction. As there is a disagreement of opinion, the case will be certified to the supreme court for decision.